IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs June 19, 2002

## STATE OF TENNESSEE v. EDWIN NELSON LUNCEFORD

**Direct Appeal from the Circuit Court for Montgomery County**
**No. 40000421    John H. Gasaway, III , Judge**

---

**No. M2001-01207-CCA-R3-CD - Filed March 19, 2003**

---

A Montgomery County jury convicted the Defendant of robbery, and the trial court sentenced him to ten years' incarceration. In this appeal as of right, the Defendant argues (1) that the trial court erred in instructing the jury by failing to limit the definition of "property" in its instruction to the jury; (2) that the trial court erred by admitting into evidence at the sentencing hearing a transcript of a prior trial; and (3) that his sentence is excessive. Finding no error by the trial court, we affirm the judgment of the lower court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID G. HAYES and ALAN E. GLENN, JJ., joined.

Roger E. Nell, District Public Defender, Clarksville, Tennessee, for the appellant, Edwin N. Lunceford.

Paul G. Summers, Attorney General; Kathy D. Aslinger, Assistant Attorney General; John W. Carney, Jr., District Attorney General; and Lance A. Baker, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

In July 2000, the Montgomery County Grand Jury indicted the Defendant, Edwin Nelson Lunceford, for one count of robbery. Following a trial, a Montgomery County jury found the Defendant guilty of robbery, and the trial court sentenced the Defendant as a Range II multiple offender to ten years' incarceration. In this direct appeal, the Defendant argues (1) that the trial court erred in instructing the jury by failing to limit the definition of "property" in its instruction to the jury; (2) that the trial court erred by admitting into evidence at the sentencing hearing a transcript of a prior trial as proof of prior criminal behavior; and (3) that the trial court erred by imposing the maximum sentence. Having reviewed the record, we affirm the judgment of the trial court.

At the Defendant's trial, the following evidence was presented. Jason Roy Proctor, the victim, testified that he had been a soldier in the United States Army for over seven years at the time of trial. He stated that he was twenty-three years old; that he was five feet, four inches in height; and that he weighed approximately one hundred and thirty pounds.

The victim reported that on the evening of May 9, 2000,[1] he went to a bar in Clarksville called the Warehouse. While there, he met his friend, Jonathan McGee, whose nickname is Dakota, and drank one alcoholic beverage. The victim stated that while they were at the Warehouse, McGee asked to wear the victim's bandana, and the victim acquiesced, with the agreement that McGee would return the bandana later that evening.

The victim later left the Warehouse and went to the Golden Nugget, another bar located in Clarksville. The victim testified that at the second bar, he played pool and talked to friends. He stated that he again saw McGee at the Golden Nugget and spoke to him about the bandana. McGee told the victim that he was leaving and that the bandana was in his car, and he asked the victim to walk to his car to retrieve the bandana. The victim therefore left the bar and followed McGee out to the parking lot at approximately 1:00 a.m.

The victim stated that he stopped by his own truck to get some cigarettes and then proceeded to McGee's car. McGee handed the bandana to the victim; said, "hey, thanks"; and then shut the door to his car. At this point, the victim felt someone grab his arm from behind and twist it behind his back. The person then pushed him against the car, causing him to strike his head against the vehicle, and "busted [his] lip." The victim stated that he "stayed still" because he did not want to provoke the person and because he was afraid. He testified that the person took his bandana and his wallet, containing thirty dollars, from his back pocket. The victim reported that when the robber physically turned him around, he was able to see the robber's face. At trial, the victim identified the Defendant as the person who robbed him. The victim recalled that after taking the bandana and wallet, the Defendant threatened to injure him further or to kill him if he "[told] anything or [said] anything." The Defendant then released the victim, the victim walked away, and the Defendant got into McGee's car on the passenger's side. The victim testified that he later found his wallet in the parking lot, but the money that had been inside the wallet was gone.

On cross-examination, the victim recalled that the Defendant told him after the robbery that he would return the bandana the following day. He also stated that he waited between five and ten minutes after the robbery to call the police. The victim explained that the bandana taken by the Defendant was special to him because it had been given to him by his father.

---

[1] There is some confusion in the record concerning the actual date of the crime. The victim was questioned about events that took place on May 10, 2000, and the indictment in this case indicates that the crime took place on May 10, 2000. We note, however, that on other occasions at trial, attorneys for both sides referred to the date of the crime as June 10, 2000.

Jonathan McGee testified that he knew both the Defendant and the victim. He stated that he had previously worked at the Golden Nugget as a security guard when the victim frequented the establishment. He stated that he began to work with the Defendant during April 2000, and he testified that he transported the Defendant to and from work.

McGee testified that on the night of the crime in this case, he went to the Warehouse with the Defendant, where he also saw the victim. He recalled that after he conversed with the victim, the victim allowed him to borrow a bandana for the night. He stated that he left the Warehouse with the Defendant, briefly stopped at another bar called Kickers, and then went to the Golden Nugget. At the Golden Nugget, McGee saw the victim again, and the victim inquired about the bandana. McGee recalled that he told the victim that the bandana was inside his car, and McGee offered to return the bandana before leaving that night.

When McGee was ready to leave, he told the victim to follow him to his car to retrieve the bandana. McGee stated that he, the Defendant, and the victim walked out to his car, and he handed the bandana to the victim. He stated that he then got into his car, shut the door, and started the engine. McGee testified that he noticed that "[t]he car shook a little bit," and he saw that the victim and the Defendant were "getting into a slight altercation." McGee recalled that the Defendant "had [the victim] up against the car." He stated that the dispute lasted "hardly any time at all," and then the Defendant got into the passenger's seat of his car. According to McGee, the Defendant handed him the bandana, and McGee then transported the Defendant home. He stated, "I really didn't want to get involved in it, but I knew [the victim] and I could always give [the victim] his bandana . . . ." McGee reported that he gave the bandana to police the following morning. When asked whether the Defendant knew that the bandana belonged to the victim, McGee stated that he did not "see how it could have been presumed" that the bandana belonged to McGee. Finally, McGee testified that he did not see the Defendant threaten, strike, hit, or kick the victim.

Detective Rodney E. Porter of the Clarksville Police Department testified that he had been involved in law enforcement for ten years and stated that he investigated the robbery in this case. He reported that he interviewed the Defendant at his home in Kentucky on the afternoon following the crime. Porter testified that the Defendant first told him that he and "Dakota" had gone out to bars the previous evening, visiting the Golden Nugget immediately before heading home. Porter reported that the Defendant later told him that he remembered the victim, but "never touched him." According to Porter, however, the Defendant admitted at his preliminary hearing that he grabbed the victim, pushed him against McGee's car, and took the bandana. Porter stated that he did not think that the Defendant admitted taking money from the victim's wallet. Porter testified that he received the bandana from McGee. He also introduced into evidence a photograph of the victim taken near the time of the robbery that depicted an injury to the victim's lip.

The Defendant testified that he was thirty-eight years old; that he was six feet, two inches tall; and that he weighed approximately 230 pounds. The Defendant stated that at the time of the crime, he was working at G and A Masonry, where he was making $14.15 per hour. The Defendant

testified that on Wednesday, May 10, 2000, he coached a Little League game. He stated that he did not go to bars on Wednesdays.

The Defendant testified that he recalled being paid "[t]wo hundred and thirteen dollars and some change" on Friday, June 9, 2000. He stated after leaving work at approximately 3:30 p.m., McGee drove him to the bank to make a deposit. He reported that he deposited $100 of his paycheck and kept the rest in cash.

The Defendant testified that later that night, he and McGee went to the Warehouse, Kickers, the Golden Nugget, and Front Page Deli. He recalled that when they stopped at the Warehouse, he spoke with people there whom he knew and drank a couple of beers. He stated that they stopped at the Golden Nugget on their way home.

The Defendant testified that as he left the Golden Nugget, he saw the victim follow McGee to McGee's car. He claimed that as the victim walked to the car, the victim placed his hand in the middle of the back of his pants, and followed McGee "right on [McGee's] feet." The Defendant stated that because the victim was wearing a vest, he could not see what the victim was doing with his hand, and he thought that the victim might have a weapon.

The Defendant recalled seeing McGee give the victim his bandana. The Defendant claimed that as McGee was getting into the car, the Defendant grabbed the bandana, "spun [the victim] around," grabbed both of the victim's arms, pushed the victim into the car, and told him "to drop it" at least twice. He stated that he believed the victim was armed because the victim had been angry at McGee inside the bar and then "stuck his hand . . . in his pants . . . like in a gesture of getting something." The Defendant explained that he had been employed as a security guard for a few years, and he also stated that he had been stabbed.

The Defendant testified, however, that after he pinned the victim against the car, the victim merely dropped the bandana. He stated that he told the victim that "he was a fool. . . . [f]or coming up behind someone like that in the parking lot at night time and acting like he had a weapon." He testified that he also told the victim that he "could get his butt whipped." The Defendant claimed that he then took the victim's bandana, over protests by the victim, "to teach [the victim] a lesson." He stated that he told the victim, "[Y]ou can come back here tomorrow and get it, but you are not getting it tonight because you were crazy for doing that." The Defendant estimated that the entire encounter lasted about a minute and a half. The Defendant testified that after the encounter, he saw the victim walk back to the bar, and he and McGee left the parking lot. He stated that he then went home.

The Defendant denied threatening to kill or hurt the victim, but admitted that he told the victim "he was lucky he didn't get his butt whipped [and] [t]hat he could have got hurt acting like that." He also denied taking the victim's money, stating, "I have never seen [the victim's] wallet, never touched his wallet, never took anything from him but the bandana . . . ." He further claimed that he intended to return to the Golden Nugget the following day to have a beer and to return the

bandana because the victim told him "the bandana come [sic] from his Dad and that's why it meant so much to him."

The Defendant admitted that he had been convicted of forgery approximately six years prior to the trial in this case and of writing a bad check approximately eight years prior to trial. However, he maintained that he was telling the truth "one hundred percent" at trial and that he had done so at his preliminary hearing in this case. He insisted that he did not rob the victim, but he admitted that he had "bullied" the victim.

Following the Defendant's testimony, the victim was recalled to the stand. He stated that he was unsure of the exact date of the crime. The victim next testified that he was not angry at McGee on the night of the crime. He further testified that when he was following McGee to McGee's car, he had his hand resting on his back as he had been trained to do during his service in the military. He maintained that he did not have a weapon and that he did not act as though he was reaching for a weapon. Finally, he stated that he was very nervous to be testifying in court.

## I. JURY INSTRUCTIONS

The Defendant first argues that the trial court erred in instructing the jury on the crime of robbery. Specifically, he argues that the court erred by failing to limit the definition of "property" to the $30 alleged in the indictment to have been taken. He also contends that the court should have instructed the jury members that they must unanimously agree as to the specific item of property that was taken in order to convict the Defendant of robbery.

The indictment in this case alleged that the Defendant "unlawfully, feloniously, knowingly, intentionally, and by violence, did take from the person of Jason Roy Proctor, $30.00 in cash, by pushing the said Jason Proctor against a car and injuring his lip . . . ." At the close of proof, the trial court instructed the jury concerning the crime of robbery as follows:

> Any person who commits the offense of robbery is guilty of a crime. For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt, the existence of the following essential elements:
> (1) that the defendant knowingly obtained or exercised control over property owned by Jason Roy Proctor;
> (2) that the defendant did not have the effective owner's consent;
> (3) that the defendant intended to deprive the owner of the property;
> (4) that the defendant took such property from a person of another by the use of violence [or] by putting the person in fear;
> (5) that the defendant took such property intentionally, or knowingly.

When instructing the jury as to the specifics of these elements, the trial court defined "property" as "anything of value, including but not limited to money." Finally, we note that the trial court instructed the jury that it must reach a unanimous verdict.

It is well-established that a defendant charged with a criminal offense in Tennessee has a fundamental constitutional right to a unanimous verdict. See State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993); State v. Brown, 823 S.W.2d 576, 583 (Tenn. Crim. App. 1991). The Tennessee Supreme Court has noted that "[q]uestions regarding jury unanimity generally arise in cases where the prosecution presents evidence to the jury that tends to show more than one criminal offense, but the underlying indictment is not specific as to the offense for which the accused is being tried." State v. Lemacks, 996 S.W.2d 166, 170 (Tenn. 1999). The court has stated that "[t]o insure that the jury renders a unanimous verdict in those cases, the trial judge has an affirmative duty to require the State to elect upon which offense it is submitting for the jury's consideration." Id.

In this case, the underlying indictment was specific as to the offense for which the Defendant was tried. Although evidence was presented at trial that the Defendant took both a bandana and money from the victim, the indictment alleged only that the Defendant took money, specifically $30, from the victim. Furthermore, in its closing argument, the State emphasized that the Defendant was charged with taking $30 from the victim. For these reasons, we conclude that the trial court did not err in its instructions to the jury.

## II. ADMISSION OF EVIDENCE AT SENTENCING HEARING

The Defendant next argues that the trial court erred by admitting into evidence at the sentencing hearing the transcript of a prior trial as proof of prior criminal behavior. The record reveals that the Defendant had previously been granted immunity from prosecution in exchange for his testimony against another defendant in an unrelated murder trial. The transcript admitted at the sentencing hearing contained the Defendant's testimony at that trial. The trial court admitted the transcript based upon its finding that the transcript was relevant with regard to enhancement factor (1), which concerns a defendant's previous history of criminal convictions or criminal behavior. See Tenn. Code Ann. 40-35-114(1). The court stated that it would consider the transcript only "to the extent that it [was] probative of matters contemplated by" this enhancement factor.

The transcript at issue contains testimony by the Defendant concerning a murder committed by Donald Gene Brooks. At Brooks' trial, the Defendant testified that while Brooks held the victim's head with a knife to the victim's throat, the Defendant punched the victim twice in the jaw. The Defendant stated that he then picked up the victim's wallet at Brooks' command, and Brooks cut the victim's throat. The Defendant further testified that after Brooks cut the victim's throat, he and Brooks got into the victim's car and left, leaving the victim lying on the ground. The Defendant and Brooks later split the money from the victim's wallet, purchased "crack" cocaine with it, and smoked the cocaine. According to the Defendant's testimony, they also later took items from the victim's car, one of which the Defendant eventually pawned, and set the car on fire.

"[T]he Sixth and Fourteenth Amendments to the United States Constitution [do] not prohibit the sentencing court from considering prior criminal behavior for which there has been no conviction." State v. Winfield, 23 S.W.3d 279, 283 (Tenn. 2000). Thus, a "trial court may utilize criminal behavior shown by a preponderance of the evidence to enhance a sentence without violating

federal or state due process." State v. Carico, 968 S.W.2d 280, 287 (Tenn. 1998). In this case, the Defendant's involvement in a prior murder and his subsequent criminal activity following the murder clearly constitute criminal behavior, despite the fact that the Defendant was never charged with or convicted of a crime in connection with the murder. Furthermore, the evidence admitted at the sentencing hearing concerning this prior incident consisted of sworn testimony by the Defendant in a prior trial. For this reason, we are satisfied that the evidence of the Defendant's criminal behavior was demonstrated by a preponderance of the evidence. Thus, we conclude that the trial court did not err in considering the transcript or in using the Defendant's testimony in the prior trial to enhance his sentence in this case. Nevertheless, assuming that the trial court did err by considering the transcript, such error is harmless. The Defendant's lengthy criminal record of convictions amply supports the trial court's application of enhancement factor (1) in sentencing the Defendant. See Tenn. Code Ann. § 40-35-114(1).

## III.  SENTENCING

Finally, the Defendant contends that the trial court erred by imposing the maximum sentence. The trial court sentenced the Defendant as a Range II multiple offender to ten years' incarceration. The sentencing range for a Range II offender convicted of a Class C felony is between six and ten years. See Tenn. Code Ann. § 40-35-112(b)(3).

When a criminal defendant challenges the length, range, or manner of service of a sentence, the reviewing court must conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d). This presumption, however, "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). In the event that the record fails to show such consideration, the review of the sentence is purely de novo. State v. Shelton, 854 S.W.2d 116, 123 (Tenn. Crim. App. 1992).

In making its sentencing determination, the trial court, at the conclusion of the sentencing hearing, determines the range of sentence and then determines the specific sentence and the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing, (2) the presentence report, (3) the principles of sentencing and arguments as to sentencing alternatives, (4) the nature and characteristics of the criminal conduct involved, (5) evidence and information offered by the parties on the enhancement and mitigating factors, (6) any statements the defendant wishes to make in the defendant's behalf about sentencing, and (7) the potential for rehabilitation or treatment. Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5); State v. Williams, 920 S.W.2d 247, 258 (Tenn. Crim. App. 1995).

The presumptive sentence to be imposed by the trial court for a Class B, C, D or E felony is the minimum within the applicable range unless there are enhancement or mitigating factors present. Tenn. Code Ann. § 40-35-210(c). If there are enhancement or mitigating factors, the court must start at the presumptive sentence, enhance the sentence as appropriate for the enhancement factors, and

then reduce the sentence in the range as appropriate for the mitigating factors. Id. § 40-35-210(e). The weight to be given each factor is left to the discretion of the trial judge. Shelton, 854 S.W.2d at 123. However, the sentence must be adequately supported by the record and comply with the purposes and principles of the 1989 Sentencing Reform Act. State v. Moss, 727 S.W.2d 229, 237 (Tenn. 1986).

When imposing a sentence, the trial court must make specific findings of fact on the record supporting the sentence. Tenn. Code Ann. § 40-35-209(c). The record should also include any enhancement or mitigating factors applied by the trial court. Id. § 40-35-210(f). Thus, if the trial court wishes to enhance a sentence, the court must state its reasons on the record. The purpose of recording the court's reasoning is to guarantee the preparation of a proper record for appellate review. State v. Ervin, 939 S.W.2d 581, 584 (Tenn. Crim. App. 1996). Because the record in this case indicates that the trial court adequately considered the enhancement and mitigating factors as well as the underlying facts, our review is de novo with a presumption of correctness.

Enhancement factors must be "appropriate for the offense" and "not themselves essential elements of the offense." Tenn. Code Ann. § 40-35-114.

> The obvious purpose of these limitations is to exclude enhancement factors which are not relevant to the offense and those based on facts which are used to prove the offense. Facts which establish the elements of the offense charged may not also be the basis of an enhancement factor increasing punishment. The legislature, in determining the ranges of punishment within the classifications of offenses, necessarily took into account the culpability inherent in each offense.

State v. Jones, 883 S.W.2d 597, 601 (Tenn. 1994).

If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then we may not modify the sentence "even if we would have preferred a different result." State v. Fletcher, 805 S.W.2d 785, 789 (Tenn. Crim. App. 1991). The defendant bears the burden of showing the impropriety of the sentence imposed. Ashby, 823 S.W.2d at 169.

In sentencing the Defendant, the trial court applied two enhancement factors: (1) "[t]he defendant has a previous history of criminal convictions or criminal behavior in addition to those necessary to establish the appropriate range," Tenn. Code Ann. § 40-35-114(1), and (8) "[t]he defendant has a previous history of unwillingness to comply with the conditions of a sentence involving release in the community." Id. § 40-35-114(8). In applying enhancement factor (1), the trial court noted that the presentence report revealed that the Defendant had twenty-three previous misdemeanor convictions. The court also noted that "[t]he criminal behavior engaged in by the Defendant . . . includes possession of a schedule[] two substance, theft of property, aggravated assault, arson, facilitation of first degree murder if not first degree felony murder." In applying enhancement factor (8), the trial court noted that the Defendant violated a six-month probated

sentence in 1988; that he violated an eleven-month, twenty-nine-day probated sentence in 1989; that he violated a five-year probated sentence in 1990; and that he violated an eleven-month, twenty-nine-day probated sentence in 2000.

The court further found that two mitigating factors applied. It applied mitigating factor (1), that "[t]he defendant's criminal conduct neither caused nor threatened serious bodily injury." Id. § 40-35-113(1). It also applied mitigating factor (13), the catchall provision, see id. § 40-35-113(13), stating, "[T]he Court finds that the Defendant suffers from drug and alcohol addi[c]tions that contribute [to] his repeated criminal conduct." The court then found that the enhancement factors "heavily" outweighed the mitigating factors and thus imposed the maximum sentence.

The record supports the imposition of these factors by the trial court, and as we have previously stated, the weight granted to each factor is within the discretion of the trial judge. Shelton, 854 S.W.2d at 123. Furthermore, our review indicates that the trial court followed proper sentencing procedure and imposed a lawful sentence after considering the factors and sentencing principles. For these reasons, we may not modify the sentence imposed. Fletcher, 805 S.W.2d at 789.

Accordingly, we AFFIRM the judgment of the trial court.

_____
ROBERT W. WEDEMEYER, JUDGE